# IN THE COURT OF APPEALS OF IOWA

No. 23-0857
Filed October 11, 2023

**IN THE INTEREST OF D.F.,**
**Minor Child,**

**M.F., Father,**
 Appellant.
_____

 Appeal from the Iowa District Court for Polk County, Brent Pattison, District Associate Judge.


 A father appeals the termination of his parental rights. **AFFIRMED.**


 Miguel A. Alvarado of Branstad & Olson Law Office, Des Moines, for appellant father.

 Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

 Donna M. Schauer of Schauer Law Office, Adel, attorney and guardian ad litem for minor child.


 Considered by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

A father who had trouble meeting his own needs, let alone those of his child born in 2018, appeals the termination of his parental rights under Iowa Code section 232.116(1)(f) (2022).[1]   He challenges each of the three steps in the termination analysis and claims termination violated his substantive due process rights.  We affirm on our de novo review of the record.

**I.       Background Facts and Proceedings**

Beginning when the child was just a few months old, the Iowa Department of Health and Human Services began investigating reports that her parents were using illegal substances.  By May 2021, the reports had evolved into claims by the father that the child was being sexually abused by the mother's boyfriend.  At the time, the father had physical care of the child, and the mother had frequent visitation under a district court custody decree.

The father subjected the three-year-old child to four sexual assault examinations and three forensic interviews, none of which confirmed his claims of sexual abuse.  During this process, the father disclosed that he was taking full-body nude pictures of the child—including explicit images of her vagina—before and after her visits with the mother to document his concerns about sexual abuse. The father stored these photographs on zip drives and, according to the removal application, offered to "share the images with anyone he talks to regarding his belief that [the child] is being sexually abuse[d]."  While these allegations were being made, the father was living in a homeless shelter with the child and had

---

[1] The mother's parental rights were not terminated.

3

"significant mental health needs" that he was not addressing. Those needs were documented by the child's therapist, who notified the department that she was concerned for the child's safety because of the father's unstable mental health. The child was accordingly removed from the father's custody, placed with the mother, and adjudicated in need of assistance.

After the child was removed from his custody, the father overdosed on methamphetamine, leading to a hospitalization in January 2022. The department did not find out about this overdose until later. The father's mental health continued to deteriorate after that, with the father checking himself into a hospital in March because "he felt he was not in a good place mentally." Although hospital staff wanted to keep the father there longer, the father left after about a week. On top of his poor mental health, the department was concerned the father might have relapsed on heroin because he told the caseworker that "someone from a past relationship had been slipping 'dope' in his coffee in the morning." As a result, the department started administering drug tests. By June, the department became more concerned about the father's drug use because he would not participate in testing or substance-abuse treatment.

In late August, the father underwent an "addiction assessment," during which he disclosed a long history of substance abuse that started when he was ten years old. He reported that his drug of choice was methamphetamine, with his most recent use just a few days earlier. In early September, the father attempted to commit suicide and threatened a state trooper with a knife. He was involuntarily hospitalized but, after he assaulted hospital staff and security while trying to leave, he was arrested and taken to jail. In its October report to the court, the department

4

noted that even though the father was receiving advocate and life services, his mental health was not improving. And he was declining "to participate in recommended services," including visits with the child. So the department recommended proceeding to termination of the father's parental rights.

By the permanency hearing in November, the father had been released from jail. He was temporarily residing in a housing program for adults with mental-health issues and tested positive for methamphetamine the day of the hearing. Still focused on his concerns that the child was being sexually abused in the mother's care, the father called the child's therapist as a witness at the hearing. The therapist testified the child had recently made sexual abuse allegations against her mother's roommate. According to the department caseworker, those allegations were investigated and not confirmed. And after the allegations surfaced, the mother moved out of her apartment with that roommate and into her father's home. At the end of the hearing, the father requested a six-month extension to show that he could "make progress toward safely caring for" the child, which he argued the mother could not do because of the sexual abuse allegations.

The juvenile court denied the father's request, noting an extension could not be granted based on a hope the father "might get things together in the next three to six months." Because the court concluded "we're in the same place today that we were at the start of this case," the court directed the State to file a termination petition. In doing so, however, the court encouraged the father "to get back into real substance abuse treatment," participate in services, and make termination "a hard decision for me."

Unfortunately, the father did not take the court's encouragement to heart. In December, he was arrested for public intoxication, possession of drug paraphernalia, and interference with official acts. He stayed in jail until late January 2023. The father skipped a drug test a few days after his release, becoming irate with the caseworker who requested it. The department requested another drug test in early February, but the father declined. He did have a sweat patch put on about a week later but, according to him, it fell off.

A termination hearing was held over two days in February and April. On the first day in February, the father agreed that he was only partially complying with treatment recommendations for his diagnosed substance-abuse disorders. And he was not participating in any individual mental-health services. Though the father was still unemployed and living in a group home, he testified, "If I get custody of my daughter today, I can have a place to go. I will have a job as of tomorrow." Just a few days later, however, the father was involuntarily committed for one week because he told service providers that he had cut himself with a knife, which he carried "in case he 'needed to harm others or himself.'"

By the second day of the hearing in April, the father had been kicked out of substance-abuse treatment because he punched a hole in the wall at the facility. And even though mental-health treatment had been recommended when he was released from the hospital, the father had not started that treatment yet. At the end of the hearing, the father's counsel argued, among other things, that "terminating [his] parental rights today would be a violation of his constitutional right as a parent because it is not narrowly tailored to the compelling government

interest," since "there are other options," like granting the district court concurrent jurisdiction to modify custody.

In its ruling, the juvenile court determined the child could not be returned to the father's custody because he had not addressed his significant substance-abuse and mental-health problems. Given the father's continuous instability and dangerous behavior, the court found termination was in the child's best interests. The court declined to apply the relative exception to termination because of the strained relationship between the parents, coupled with the father's instability. Finally, the court rejected the father's due process claim. The court continued the child's placement in her mother's custody under department supervision. The father appeals.

## II.    Analysis

We apply a three-step analysis in conducting our de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3).

### A.    Ground for Termination

Beginning with the first step, the father challenges the final element of Iowa Code section 232.116(1)(f)—that the child could not be returned to his custody at the time of the termination hearing.[2]    *See* Iowa Code § 232.116(1)(f)(4); *In re*

---

[2] *See In re B.W.*, No. 23-0518, 2023 WL 4759462, at *3 n.5 (Iowa Ct. App. July 26, 2023) (discussing the two different interpretations in our case law for finding that

*D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). On this point, the father only argues that he was employed and had funds to obtain his own housing. The father fails to acknowledge the ongoing presence of his unaddressed mental-health and substance-abuse issues, which served as large barriers to reunification. We affirm the juvenile court on this point. *See, e.g.*, *In re A.D.*, No. 19-1459, 2020 WL 105093, at *4 (Iowa Ct. App. Jan. 9, 2020) (finding children "could not safely return to [mother's] custody at the time of the termination hearing" due to her "unaddressed mental-health and substance-abuse issues").

### B.     Best Interests

Turning to the second step, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child" in determining whether termination is in a child's best interests. Iowa Code § 232.116(2); *see also In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) ("[T]he child's safety and need for a permanent home are paramount concerns.").

The father first seems to argue termination of his rights is not in the child's best interests because of the sexual abuse allegations in the mother's care. But, as the juvenile court observed, the recent allegation was not confirmed. And the mother sought to ensure the child's safety by cutting off contact with the alleged abuser and moving in with a relative. Next, the father cites research that says children who have present fathers are more likely to go to college and less likely

---

children "cannot be returned" to parental custody). Our conclusion is the same under either interpretation.

to go to jail or experience teen pregnancy. Maybe that's true statistically speaking, but the father's behavior during these proceedings shows that he would be, at best, a bad example for his daughter if his parental rights remained intact. Lastly, the father argues termination will cut off the child's legal connections to the father's extended family. But the record shows the only family member the child has ever had a relationship with is a paternal great-grandmother. And other than one video chat, the child has had no contact with that relative since before removal. Given the child's young age, we do not find this circumstance tips the scales against termination.

## C.      Statutory Exception

Third, the father claims the court erred in declining to apply the permissive exception to termination in section 232.116(3)(a), which authorizes the court to forgo termination when "[a] relative has legal custody of the child." We first note that the application of a statutory exception to termination, if one exists, is "permissive, not mandatory." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (citation omitted).

On this point, while the father acknowledges the parents' history of co-parenting conflict, he argues there was no evidence that this discord continued to exist. To the contrary, there was ample evidence that the parents' relationship was in a state of permanent decay. They had an active no-contact order between them at the time of the termination hearing. And the mother's counsel told the court at the permanency and termination hearings that the mother does not believe she will ever be able to safely co-parent with the father. The department caseworker echoed that concern. So we find no error in the juvenile court's refusal

to apply this exception.  *See In re A.S.*, 906 N.W.2d 467, 478 (Iowa 2018) (indicating permanency options short of termination are more workable when there is a "close, mature, and healthy relationship that is free of conflict" between those involved (citation omitted)).

### D.     Substantive Due Process

Finally, the father claims termination violates substantive "due process and impermissibly infringes on his constitutional rights as a parent."  He argues the juvenile court's decision was not narrowly tailored to serve a compelling state interest of child welfare because alternatives to termination were available, like application of the relative exception in section 232.116(3)(a).

But "so long as one of the statutory grounds for termination is established by clear and convincing evidence, substantive due process is not offended by termination of the parent's parental rights."  *In re K.M.*, 653 N.W.2d 602, 608 (Iowa 2002) (cleaned up); *accord In re P.S.*, Nos. 21-0395, 21-0779, 2022 WL 120411, at *2 (Iowa Ct. App. Jan. 12, 2022) (finding no substantive due process violation where "the State proved a statutory ground for termination").  Furthermore, we have already concluded termination of the father's rights is in the child's best interests.  *See K.M.*, 653 N.W.2d at 608–09 (noting that "[f]ocusing on the best interests of the child once the statutory prerequisites for termination are met is not conscience shocking, nor is it an affront to the personal dignity of the parents" to an extent that it violates due process).  We affirm the juvenile court on this issue as well.

**AFFIRMED.**